2017 WY 154

**Steven Dean MCLAREN, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

S-17-0010

Supreme Court of Wyoming.

December 28, 2017

Representing Appellant: Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson *, Chief Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Ms. Olson.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Katherine A. Adams, Assistant Attorney General. Argument by Ms. Adams.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

FOX, Justice.

[¶1] Steven D. McLaren challenges convictions for five felonies stemming from a bizarre and violent encounter with his girlfriend in March of 2014. He claims that the trial court violated his due process rights when it failed to order a third competency evaluation and when it allowed defense counsel to assert a plea of not guilty by reason of mental illness (NGMI) against his will. He also argues that the jury instructions contained structural error because they did not require the State to prove he did not act in a sudden heat of passion to establish attempted second-degree murder and that the trial court abused its discretion when it denied defense counsel's motion for mistrial after Mr. McLaren's outburst during trial. We conclude that, while the trial court did not improperly fail to order a competency hearing, it violated Mr. McLaren's due process rights when, in spite of Mr. McLaren's numerous declarations that he did not wish to proceed with the NGMI plea, it allowed defense counsel to assert the plea at trial. We reverse and remand.

### ISSUES

[¶2] We reorder and rephrase the issues as follows:

1. Did the trial court violate Mr. McLaren's constitutional rights when it failed to suspend the proceedings on its own motion and request a competency evaluation?

2. Did constitutional error occur when trial counsel proceeded on a not guilty by reason of mental illness plea against the will of his client?

3. Did structural error occur in connection with Mr. McLaren's attempted second-degree murder conviction because the jury instructions did not indicate that the State had to prove beyond a reasonable doubt that Mr. McLaren did not act in a sudden heat of passion?

4. Did the trial court abuse its discretion when it denied the defense's motion for a mistrial after Mr. McLaren jumped up from his chair, moved toward the jury and the door, and yelled expletives in the presence of the jury?

[¶3] We address the first and second issues because of the interplay between competency and the NGMI plea. Our ruling on the second issue is dispositive. Therefore, we address

* An order granting Ms. Olson's Motion to Withdraw was entered on December 13, 2017.

the third issue only to a limited extent to provide guidance on remand and we do not reach the last issue. *See Sadler v. State*, 2016 WY 56, ¶ 2, 375 P.3d 728, 728 (Wyo. 2016); *Thomas v. State*, 2003 WY 53, ¶ 30, 67 P.3d 1199, 1206 (Wyo. 2003).

## FACTS

[¶4] Mr. McLaren owned 57 cats. He and his girlfriend, Jennifer Evans, referred to the cats as their "kids" or "the kid." On March 10, 2014, one of Mr. McLaren's exotic Savannah kittens, Cameo, was sick, so he and Ms. Evans took it to a veterinary clinic for treatment. Mr. McLaren testified that he had injected "somewhere between a quarter and a third of a gram" of methamphetamine right before he noticed Cameo was ill, had not slept for days, and had been experiencing hallucinations since the night before. He was under the impression that Ms. Evans was attempting to harm or kill the kitten.

[¶5] After leaving Cameo at the veterinary clinic, they went to a convenience store where Mr. McLaren purchased a pack of cigarettes. The convenience store clerk testified that Mr. McLaren's behavior "threw a red flag," he was "pacing back and forth, walking just a little weird," and she kept an eye on him because she thought he was going to steal something. After Mr. McLaren left the convenience store, he and Ms. Evans drove around a nearby neighborhood looking at houses. Ms. Evans testified that at that time Mr. McLaren was "normal" and did not appear to be mad at her, but that they were "upset about the cat."

[¶6] When they left the neighborhood, they stopped at a stop sign. According to Ms. Evans, that was when Mr. McLaren started acting "weird." Mr. McLaren turned to Ms. Evans and said, "I know what you did. You bathed in their blood." He then headed northbound on Yellowstone Road toward Highway 191, driving erratically, hitting speeds of over eighty miles per hour. He drove on the wrong side of the road, nearly colliding head-on with two separate vehicles and causing both to veer off the road. He called Ms. Evans names and told her that she "needed to pay for [her] sins." Mr. McLaren told Ms. Evans that she "was going

to die" and that she "wasn't going to live to see tomorrow." He asked her why she killed their neighbors and told her he could smell their blood on her body.

[¶7] Mr. McLaren continued driving north on Highway 191, coming to a stop in the southbound lane in front of an oncoming Pepsi truck. Ms. Evans attempted to get out of Mr. McLaren's truck, but he pulled her by her hair back into the truck and locked the doors, telling her that her "kids deserved a better mother" and that she "was going to die today." The Pepsi truck swerved around them, and Mr. McLaren turned off Highway 191, onto Wild Horse Loop. As he drove down Wild Horse Loop, Ms. Evans fought with Mr. McLaren and continued to attempt to get out, kicking the truck into park several times. Mr. McLaren also continued to hit and punch Ms. Evans; he grabbed her throat and forced her to the floorboard of the truck.

[¶8] Mr. McLaren stopped the truck and hit Ms. Evans three times in the head with a Maglite flashlight that contained no batteries. There is conflicting testimony about whether he hit her while he was in the driver's seat of the truck or whether he hit her after he walked around to the passenger side of the truck. In any event, Mr. McLaren ultimately opened the passenger door and Ms. Evans fell out of the truck. Ms. Evans testified that Mr. McLaren stood over her, pulled her head to the left and the right, "trying to rip my head off," and then let go. As soon as Mr. McLaren released her, Ms. Evans got up and ran toward Highway 191, where a truck stopped to assist her. When Ms. Evans arrived at the emergency room, she had two lacerations on her head and numerous bruises.

[¶9] Mr. McLaren testified that the night before these events transpired, he saw a roe deer jump over his truck and that he saw "what looked like a woman with like the top of a deer, the color of deer, and real long black hair, and I don't know how or why, but I got it in my head all of a sudden that it was something like a 'jagula' or a devil woman, and I was kind of like really freaked out." He also testified that "[a]ll the time in the truck, I was ... seeing this [jagula] but it was kind

of out of my peripheral vision. If I looked at [Ms. Evans], I didn't see anything like that. I seen [Ms. Evans]." Mr. McLaren described driving past the truck that had stopped to help Ms. Evans after she ran away, stating that he "started seeing something out of [his] peripheral vision" and "took off." He then drove to a spot in the desert where he had a 360-degree view because he was "freaking out." Mr. McLaren testified that "I had in my mind that there was—there was a 'jagular' or devil woman or a feline creature that wasn't just a cat, and ... I don't know where it came from." He also testified that he saw a "jagula" in his truck. Mr. McLaren described a vision he had while he was in the desert: "I remember I seen something so fantastic at the bull works. ... I can see the four pillars out at bull works, and then the side of an arch, it was perfect, and I couldn't believe what I was seeing .... I honestly believe that it's preflood." The sheriff who arrived on scene testified that when he first made contact with Mr. McLaren, he "seemed to be rambling" and that "he was saying something about aliens that were jumping from sagebrush to sagebrush in front of him as he was faced looking out across the desert," but that he did not appear to be confused and he was able to follow commands.

[¶10] Mr. McLaren was charged with five felonies: attempted second-degree murder, strangulation of a household member, two counts of aggravated assault, and kidnapping.[1] The procedural history is complex, due in large part to competency evaluations and hearings on Mr. McLaren's counsel's motions to withdraw, which will be discussed in greater detail as they become relevant to the issues raised in this appeal. Suffice it to say that Mr. McLaren underwent two competency evaluations, one ordered by the circuit court in March of 2014, which was completed in June of 2014, and one ordered by the district court on the eve of a December 2015 trial date, completed in February of 2016. At both evaluations, Mr. McLaren was found competent to proceed. Mr. McLaren was also evaluated in February of 2015 and April of 2015 regarding his criminal responsibility af-

ter defense counsel filed a motion to change his plea to NGMI.

[¶11] A five-day jury trial commenced on April 11, 2016, and the jury found Mr. McLaren guilty on all counts. Mr. McLaren was sentenced to consecutive terms in prison of not less than twenty-four to twenty-eight years on attempted second-degree murder, four to five years for strangulation of a household member, eight to ten years on each aggravated assault count, and twenty-four years to twenty-eight years for kidnapping. Mr. McLaren timely filed this appeal.

[¶12] Additional facts will be discussed as they relate to the issues Mr. McLaren raises.

## DISCUSSION

### I. Did the trial court violate Mr. McLaren's constitutional rights when it failed to suspend the proceedings on its own motion and request a competency evaluation?

[¶13] Wyo. Stat. Ann. § 7-11-302 (LexisNexis 2017) sets forth the standard for mental competency of a defendant to proceed in a criminal case:

(a) No person shall be tried, sentenced or punished for the commission of an offense while, as a result of mental illness or deficiency, he lacks the capacity to:

(i) Comprehend his position;

(ii) Understand the nature and object of the proceedings against him;

(iii) Conduct his defense in a rational manner; and

(iv) Cooperate with his counsel to the end that any available defense may be interposed.

[¶14] "Although the question of competency is a factual issue, the requirement that competency be established is a matter of law that is reviewed *de novo.*" *Wilson v. State,* 2007 WY 55, ¶ 11, 155 P.3d 1009, 1011 (Wyo. 2007); *see also deShazer v. State,* 2003 WY 98, ¶ 12, 74 P.3d 1240, 1244-45 (Wyo. 2003). Further, "[i]f it appears at

---

1. The State added sentencing enhancements to the aggravated assault counts in an amended information filed July 8, 2014.

any stage of a criminal proceeding, by motion or upon the court's own motion, that there is reasonable cause to believe that the accused has a mental illness or deficiency making him unfit to proceed, all further proceedings shall be suspended" and the "court shall order an examination of the accused . . . ." Wyo. Stat. Ann. § 7-11-303(a) & (b) (LexisNexis 2017). "We apply the substantial evidence standard when reviewing a trial court's decision not to order a further competency evaluation." *Marshall v. State*, 2016 WY 119, ¶ 12, 385 P.3d 304, 308, (Wyo. 2016).

[¶15] Mr. McLaren's competency was evaluated twice, once shortly after the information was filed and a second time before trial. He was found competent on both occasions. Nevertheless, on appeal, Mr. McLaren contends that the district court should have suspended his trial and sua sponte ordered another competency evaluation. To properly address Mr. McLaren's argument, we will examine the competency evaluations, his relationship with counsel, and his behavior leading to and during trial.

### Mr. McLaren's first competency evaluation

[¶16] The information charging Mr. McLaren was filed in the circuit court on March 12, 2014. On March 17, 2014, Mr. McLaren's court-appointed defense counsel filed a Motion for Psychological Evaluation, stating that Mr. McLaren "does not appear to have the ability to assist counsel in his defense." The circuit court suspended proceedings and ordered an examination to determine Mr. McLaren's competency to proceed.

[¶17] Dr. McCormick at the Wyoming State Hospital examined Mr. McLaren and found him fit to proceed. In her June 9, 2014 letter to the circuit court, Dr. McCormick concluded:

[T]his examiner is of the opinion the Defendant's preliminary primary diagnosis is Unspecified Dissociative Disorder (partial Dissociative Identity Disorder) with an important rule out of severe Borderline Personality Disorder.

The Defendant clearly has a history of abusing drugs, particularly more recently methamphetamines, and a remote history of abusing alcohol. His abuse of substances almost certainly exacerbates his dissociative tendencies. The Defendant also appears to meet criteria for Major Depressive Disorder, which is a common comorbid condition among those who experience problematic dissociative states, have a history of trauma, and recurrent substance abuse issues.

The Defendant is currently in a structured environment and does not have access to substances. He is also receiving medication for symptoms of depression. Moreover, there was no evidence or indication Mr. McLaren's mental health problems directly or grossly impacted his adjudicative capacities in a negative manner. Therefore, in conclusion, this examiner is of the opinion the Defendant does not lack the capacity to comprehend this position, understand the nature and object of the proceedings against him, conduct his defense in a rational manner, or corroborate with his counsel to the end that any defense may be interposed.

[¶18] The record does not reveal whether the circuit court found Mr. McLaren competent to proceed; however, it held a preliminary hearing and, on July 9, 2014, bound the case over for trial in the district court.

### Mr. McLaren's NGMI Evaluation

[¶19] In November of 2014, Mr. McLaren changed his plea and entered an NGMI plea to all counts. The district court suspended proceedings and ordered an evaluation to determine whether Mr. McLaren "has a mental illness or deficiency" and whether "at the time of the alleged criminal conduct [Mr. McLaren], as a result of mental illness or deficiency, lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law," in accordance with Wyo. Stat. Ann. § 7-11-304(f) (LexisNexis 2017).

[¶20] Dr. McCormick also conducted this "NGMI" evaluation and submitted her findings in a report dated February 10, 2015. Dr. McCormick opined that, based upon reports of Mr. McLaren, the alleged victim, and law enforcement, "at the very least, Mr. McLar-

en was going in and out of a psychotic state around and at the time of the alleged offenses." However, she observed that despite this, "he did not provide a description that would suggest a strong link between his psychosis and the capacity to determine right from wrong and conform his conduct to the requirements of the law." Dr. McCormick also remarked that "his own recollections and observations by law enforcement suggest McLaren was undergoing a Methamphetamine-Induced Psychotic Episode." She concluded that "even if [his] capacities were compromised to a substantial degree, he would still not qualify for the NGMI defense since his mental state was self-induced by drugs."

[¶21] The district court held a hearing regarding the NGMI evaluation in which it informed Mr. McLaren that he had the option to get a further evaluation if he desired. Mr. McLaren stated that he thought the report was "sloppy" because Dr. McCormick did not know whether he was charged with attempted second-degree murder or attempted first-degree murder. Mr. McLaren indicated that he would like another evaluation; the court instructed him to discuss the matter with his attorney and, if they determined another evaluation would be desirable, to "file something" quickly. The court set the trial for April, but informed Mr. McLaren that proceedings would have to be suspended if another evaluation was requested.

### Mr. McLaren's relationship with counsel and pretrial courtroom behavior

[¶22] Approximately one month later, Mr. McLaren's attorney filed a motion to withdraw as counsel for Mr. McLaren. In support of that motion, the attorney stated that he and Mr. McLaren had "repeatedly discussed whether the proceedings should be delayed" to obtain an independent NGMI evaluation and that Mr. McLaren had "changed his mind several times." He also explained that at their most recent meeting, Mr. McLaren indicated that he wanted to represent himself, and that on previous occasions when Mr.

McLaren had displayed a similar desire, he had agreed to allow the attorney's representation to continue. At the March 27, 2015 hearing on the motion, Mr. McLaren stated that he wanted to proceed with different counsel. He complained that his attorney had failed to file exculpatory evidence, failed to investigate, and failed to return his phone calls. Mr. McLaren expressed frustration regarding his attorney's opinion that he is mentally ill: "I get treated like I'm mentally ill and that my opinion doesn't matter," and "Why do I have to be a lunatic here?" As the hearing progressed, Mr. McLaren stated, "I don't really want to change [counsel], your Honor. I just want a fair shake." Mr. McLaren then explained:

I want to be able to do an independent investigation to prove my innocence. There is [sic] mitigating circumstances here that will make this Court absolutely ill. There's a lot of money involved here.

I raised cats that are worth $35,000 a piece, your Honor, and a lot of those cats are missing at this point. They have been missing. And then I'm hearing that this girl that—this defendant—or the person that I'm accused of doing this to, she's running around town selling cats that I— that are from my stock, your Honor, selling them for 3 or $400, and my Euro connection buys these cats for $35,000. Do you think that's justice? My 85-year-old mother is having to take care of these animals.

I mean, what's going on, your Honor, is a travesty of justice, and I cannot get any forward motion.

Mr. McLaren's attorney indicated that he was willing to work with Mr. McLaren, but thought a competent defense required an independent NGMI evaluation, which required Mr. McLaren's consent. By the end of the hearing, Mr. McLaren agreed to request an independent evaluation and to cooperate with his attorney. His attorney moved for an independent NGMI evaluation, and the district court granted that motion and stayed proceedings until it could be conducted.[2]

---

**2.** The independent evaluation was apparently conducted, but its results are not contained in the record. At the November 6, 2015 motion hearing, Mr. McLaren stated that the second psychologist "agreed with the first psychologist."

[¶23] In October of 2015, Mr. McLaren's attorney filed a second motion regarding his representation, informing the district court that Mr. McLaren wished to represent himself and have his attorney act as standby counsel. The court held another hearing regarding representation. Mr. McLaren's attorney and his supervisor attended. During that hearing, Mr. McLaren's attorney indicated that Mr. McLaren had again changed his position in that he now wanted a different attorney and that his relationship with Mr. McLaren was "breaking down."

[¶24] Mr. McLaren complained about the lack of communication from his attorney and about the "ridiculous" plea agreement that his attorney had presented to him. He elaborated:

> If he would have been treating me as a client that—as a lawyer in good standing would, I would—he would know more about what's going on with my case. I just asked him about a cat that's—the base price of this cat is $200,000. In his career over 10 years, he would make approximately 6 to $10 million. He's a high percentage F1, it's 80 percent serval.

Mr. McLaren went on to describe his cat business and the effects of his incarceration on that business. He complained about his treatment at the state hospital and in jail, claiming that his back was "busted" and that the "off the charts" methane content at the jail was affecting his health. Mr. McLaren also disapproved his attorney's strategy regarding the NGMI plea. Mr. McLaren accused his attorney of lying to him, and changed his mind several times regarding representation, stating that he wanted to represent himself, that his attorney has an "awesome reputation" and would be his "best bet," and that he would like his attorney's supervisor to represent him. The district court suggested that Mr. McLaren discuss his options with the supervising attorney, after which the court would reconvene the hearing. When the hearing reconvened two days later, Mr. McLaren agreed to work with his original attorney as lead counsel and the supervising attorney as second chair. At that hearing, while discussing his attorney's participation in his defense, Mr. McLaren related "the Sheriff's Office and Southwest Task Force are dirty in this up to their eyebrows. You know, I know for a fact that this—this girl ran into a sign with her forehead …."

[¶25] On December 2, 2015, the district court held a hearing to address issues raised at the pretrial conference and heard several motions. At that hearing, Mr. McLaren declared that he would like to fire his attorney. He expressed frustration regarding his attorney "telling me I'm mentally ill." He asked if this is "[s]ome kind of kangaroo court?" and then explained, "I'm missing a $10 million breeder here, and it seems like the only thing you guys are interested in is a bunch of malarkey." The court denied Mr. McLaren's request to discharge his attorney. As the hearing progressed, the State began to discuss the victim's testimony and whether it would seek to admit prior consistent statements. Mr. McLaren became upset, interrupting the State's counsel, saying, "That's right, I'm pissed." State's counsel continued with his description of the victim's prior consistent statements. Shortly thereafter, the following exchange occurred:

[Prosecutor]: Your Honor, I—I'm sorry to interject. Mr. McLaren has been trying to talk to me and—and state—

[Mr. McLaren]: I said you're going down. You're going to lose in this case, boy.

[Supervising Defense Attorney]: [Mr. McLaren], please.

[Prosecutor]: I'm sorry to interrupt. I just wanted to make sure I understood what he was saying.

[Mr. McLaren]: I'm missing a $10 million cat, and you guys are playing cat and mouse? Give me a break, Jack Off James (phonetic).

. . . . .

Court: Mr. McLaren, it's a good time for you to practice the kind of behavior you ought to practice in front of a jury.

[Mr. McLaren]: Your Honor—

Court: You're—and don't interrupt me. I want to talk to you, and I'll give you a chance to respond, and I always have, but I'm telling you that you need to develop a demeanor for yourself that doesn't scare

the hell out of the jury, because frankly, that's what you're going to do, and if you want to be convicted, keep it up.

[Mr. McLaren]: I'm already convicted. Are you kidding me?

Court: Well, I haven't heard the case yet, so I don't know.

[Mr. McLaren]: Am I—the pictures I get are a joke. I'm missing a $10 million cat, and you guys are all playing footsy like [the victim] is some beauty queen or something. I didn't bludgeon her. This is a joke. It's a f****** sick joke.

[Supervising Defense Attorney]: [Mr. McLaren], please.

Court: Would you guys take Mr. McLaren back to the—

[Mr. McLaren]: F***—

Court: —facility. Thank you.

Later, the court described Mr. McLaren's outburst: "there was a point where he raised his arms and slammed his fists down with those belly chains, and [the Supervising Defense Attorney] moved back, and I was glad that he did, and I was going to tell him to move back if he didn't."

[¶26] Shortly thereafter, Mr. McLaren's attorney moved for an additional competency evaluation and to withdraw. The district court ordered another competency evaluation to be conducted at the Wyoming State Hospital pursuant to Wyo. Stat. Ann. § 7-11-303(c) (LexisNexis 2017).

### Mr. McLaren's second competency evaluation

[¶27] Dr. McCormick conducted the second evaluation and its results are contained in her February 23, 2016 report to the district court. While the evaluation recounts some disturbing comments and conduct on Mr. McLaren's part, Dr. McCormick concluded that Mr. McLaren "does not have a mental illness or mental deficiency that impairs his adjudicative competencies." She explained that

the defendant has the basic capacity to comprehend his position, understand the nature and object of the proceedings against him, conduct his defense in a rational manner, and cooperate with counsel

to the end that any available defense may be interposed if he so chooses.

[¶28] The district court held a hearing after it received Dr. McCormick's report and informed Mr. McLaren that she found him fit to proceed. The court inquired whether Mr. McLaren desired an independent evaluation or whether he agreed with Dr. McCormick's evaluation and intended to go forward. Mr. McLaren did not think another evaluation would "do any good" and indicated he was prepared to go forward. The court also granted defense counsel's motion to withdraw and substituted the supervising defense attorney as counsel.

### Pretrial Order and Conference

[¶29] In its Order for Pretrial Conference, the district court found Mr. McLaren fit to proceed, noting that neither party contested Dr. McCormick's opinion that Mr. McLaren "has the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed." The court also established a deadline by which Mr. McLaren could withdraw his NGMI plea.

[¶30] At the final pretrial conference, the district court determined that Mr. McLaren would wear a stun cuff at trial because of his past behavior in court, the court's observation that he is "emotional" and "can be aggressive," and there is no way to know how the evidence would affect him at trial. During the court's discussion of the matter, Mr. McLaren interjected that he might need two stun cuffs because of his different nervous system. As the court discussed exhibits with counsel, Mr. McLaren indicated that he could "prove with the pictures that the investigators ... deliberately and maliciously set up a stage to bring about a situation for their own financial gain with Jennifer Evans in tow."

### Trial

[¶31] At trial, Mr. McLaren's behavior continued in the same vein as it had prior to trial. On the third day of trial, as the State cross-examined Dr. McCormick, inquiring

whether certain of Mr. McLaren's behaviors were rational, Mr. McLaren interrupted:

[Prosecutor]: "Once in route, he admitted he began freaking out about the money and the cat and felt as if everything that could go wrong was going wrong." That sounds like a stressor that people face daily, wouldn't you agree? Low money, your cat's dying, something you love is dying, you don't trust your partner. Does that sound like a psychosis?

[Dr. McCormick]: That aspect—

[Mr. McLaren]: —this shit. F*** you, [prosecutor], you piece of shit.

[Prosecutor]: Your Honor.

Court: Let's take a break.

(WHEREUPON the jury was escorted out of the courtroom.)

[Mr. McLaren]: F***** [prosecutor]— taking bribes—

Court: Take a break.

(WHEREUPON [Mr. McLaren] was removed from the courtroom.)

[¶32] The next day, out of the presence of the jury and during an offer of proof regarding the admissibility of facts underlying Dr. McCormick's opinion, Mr. McLaren became upset again and was removed from the courtroom. When the offer of proof ended and Mr. McLaren returned to the courtroom, the district court inquired whether he could behave properly and remain in the courtroom. Mr. McLaren responded by arguing about the evidence, stating that "the police are lying their heads off," and that "it's on the record" that he did not want to go forward with the NGMI plea and "now the prosecuting attorney is using that to" make him look stupid. He asserted that "this whole thing is a mockery of justice." The court reminded Mr. McLaren that the jury is hearing all of this too and then asked him if he would like to remain in the courtroom. Mr. McLaren responded that he would "sit here." He then stated, "I wouldn't mind getting some meth from [Sargent] Fischer. He's higher than a kite. Can we get a piss test, your honor?"

[¶33] Later that day, Mr. McLaren took the stand and testified regarding his memory of the events. His testimony was lengthy and contained minimal unusual behavior. However, during cross-examination, Mr. McLaren was handed the Maglite flashlight that was in evidence in connection with questioning regarding whether his intent was to keep Ms. Evans from getting hurt when he hit her with it, and he hit himself in the head three times with the flashlight as he testified.

[¶34] Finally, after the jury returned its verdict, Mr. McLaren refused to sit down, and told the court that "[n]ineteen of [his] [c]ivil [r]ights have been violated." When asked if he would like to do this in another room, he responded that he didn't "give a shit what you do in this room" and accused the court of being a "mockery of justice," which resulted in his removal from the courtroom.

***Was a third competency evaluation required?***

[¶35] With this background, we address the question of whether the district court should have ordered another competency evaluation, sua sponte. The district court has a continuing duty to monitor whether a defendant's competency should be evaluated. *See* Wyo. Stat Ann. §§ 7-11-303 and 7-11-304 (LexisNexis 2017); *Marshall*, 2016 WY 119, ¶ 16, 385 P.3d at 309; *Follett v. State*, 2006 WY 47, ¶ 15, 132 P.3d 1155, 1160 (Wyo. 2006); *deShazer*, 2003 WY 98, ¶ 26, 74 P.3d at 1251. "However, unless the parties avail themselves of the procedures for contesting an evaluation pursuant to Wyo. Stat. Ann. § 7-11-303(d), there must be some basis for the district court to conclude additional evaluations are warranted." *Follett*, 2006 WY 47, ¶ 15, 132 P.3d at 1160. "In other words, there must be 'reasonable cause to believe the accused has a mental illness or deficiency making him unfit to proceed' before other evaluations are mandated." *Id.* (quoting Wyo. Stat. Ann. § 7-11-303(a)); *see also Marshall*, 2016 WY 119, ¶ 16, 385 P.3d at 309.

There is no right to a continual succession of competency hearings in the absence of some new factor, and the Wyoming Rules of Criminal Procedure do not place a duty on the trial judge to hold hearing after hearing in the absence of some appearance of change in the defendant's condition since the ruling on competency was made.

*Fletcher v. State*, 2010 WY 167, ¶ 29, 245 P.3d 327, 336 (Wyo. 2010).

[¶36] Mr. McLaren contends that he "demonstrated a pattern of decompensation" during trial such that the district court had reason to suspend the proceedings and order an additional competency hearing. He asserts that his outbursts, odd statements, and ramblings about his cats made during trial should have triggered an additional competency evaluation. He argues that his case is like that of *deShazer v. State*, 2003 WY 98, 74 P.3d 1240 (Wyo. 2003). In *deShazer*, in contrast to the present case, the district court did not order that a competency evaluation be conducted, or determine competency prior to trial. The question of competency was raised before the trial court for the first time during trial. Defense counsel explained to the court that "he had had mental examinations done and the examinations established that deShazer knew right from wrong and 'that a competency defense was not appropriate,'" but that as time had passed, defense counsel became concerned that deShazer was not capable of assisting in his defense or testifying at trial. *Id.* at ¶ 21, 74 P.3d at 1249. An arrangement was made to have deShazer evaluated by Dr. Khan over the weekend break in the trial. *Id.* After the evaluation had been conducted, Dr. Khan opined that deShazer was not competent to testify on his own behalf, but in "all other respects ... has mental capacity to understand the nature of the proceedings and to assist counsel." *Id.* at ¶ 23, 74 P.3d at 1250. We concluded that considering this information, the trial court should have suspended the proceedings and ordered a mental examination of deShazer. Reversal was necessary because we were "without a sufficient record to ascertain whether or not deShazer was actually incompetent or if there was substantial evidence that [he] was competent." *Id.* at ¶ 28, 74 P.3d at 1252.

[¶37] This case is more like *Schaeffer v. State*, 2012 WY 9, 268 P.3d 1045 (Wyo. 2012). There, the trial court had ordered a competency evaluation and received a report three months prior to trial. *Id.* at ¶ 30, 268 P.3d at 1057. That report indicated that Schaeffer was competent to stand trial, Schaeffer did not object to the conclusion, and the trial court found he was competent to proceed. *Id.* On the second day of trial, defense counsel raised concerns because Schaeffer had become "agitated" and may not have been able to comprehend what was going on during trial. *Id.* at ¶ 31, 268 P.3d at 1057-58. Immediately thereafter, Schaeffer began engaging in disruptive behavior. *Id.* at 1058. The trial court concluded that "counsel's concerns did not include any information that was not considered in the previous competency determination." *Id.* We held that "[b]ecause there was no new information" to cause the trial court to believe that Mr. Schaeffer had a mental illness or deficiency rendering him unfit to proceed, it "did not err when it determined further inquiry into the appellant's competency was not warranted." *Id.* at ¶ 34, 268 P.3d at 1058-59.

[¶38] Similarly, in *Marshall v. State*, 2016 WY 119, 385 P.3d 304 (Wyo. 2016), the defendant had been evaluated for competency and was found to be competent. On appeal, he argued that the trial court should have suspended proceedings and ordered a second competency evaluation. *Id.* at ¶ 13, 385 P.3d at 308. We held that where his behaviors "were not different or distinct from the behaviors presented during the initial competency evaluation," there was "no new information presented that would give 'reasonable cause to believe the accused has a mental illness or deficiency making him unfit to proceed.'" *Id.* at ¶ 19, 385 P.3d at 310 (internal citations omitted).

[¶39] We are not persuaded that Mr. McLaren's behavior during trial constituted a change in his condition sufficient to cause the district court to reasonably believe that Mr. McLaren was unfit to proceed. Rather, this conduct is consistent with his behavior prior to trial. For example, Mr. McLaren had an outburst in the courtroom during the December 2, 2015 hearing that resulted in his removal from the courtroom, *see supra* ¶ 25, and Mr. McLaren made odd statements and perseverated about his cats on many occasions, *see supra* ¶¶ 22, 24, 25.

[¶40] In addition, his behavior at trial was consistent with behavior described in Dr. McCormick's June 2014 report regarding Mr.

McLaren's original competency evaluation. She recounted that Mr. McLaren had "periods of anger and agitation," at one point he "needed to be secluded due to his aggressive stance and a physical altercation," and he "referred to the criminal justice system as a 'bogus game.'" Dr. McCormick diagnosed Mr. McLaren with "Unspecified Dissociative Disorder (partial Dissociative Identity Disorder) with an important rule out of severe Borderline Personality Disorder" and concluded that "there was no evidence or indication Mr. McLaren's mental health problems directly or grossly impacted his adjudicative capacities in a negative manner." She opined that "the Defendant does not lack the capacity to comprehend this position, understand the nature and object of the proceedings against him, conduct his defense in a rational manner, or corroborate [sic] with his counsel to the end that any defense may be interposed."

[¶41] Mr. McLaren's behavior is also consistent with conduct noted by Dr. McCormick in Mr. McLaren's second competency evaluation: Mr. McLaren "expressed anger and frustration his case had 'taken so long,'" he "professed he had been treated unfairly at the Sweetwater County Detention Center," and "became angry and berated [Dr. McCormick] for the typo in his prior evaluation." He used expletives to describe his attorney, indicated "the sewer system is a joke at the jail," and became aggressive at one point. Dr. McCormick concluded that this behavior was not the product of major mental illness:

> The Defendant's behavior, demeanor, and self-report across time and settings does not suggest he has a severe mental illness. He does appear to suffer from some depression but his symptoms do not appear to be severe. This examiner is of the opinion the Defendant's behavior over time is most suggestive of a personality disorder characterized by a combination of Borderline Traits, Antisocial Traits, and Narcissistic Traits. Personality disorders tend to be life long, although some symptoms and behaviors can attenuate with age and during periods of calm and less stress. Individuals with significant personality pathology often display poor insight and judgment. Their use of defense mechanisms and views of themselves and the world can be distorted to such a degree that their thinking and behavior can appear non-reality based. However, this is not the same as a psychotic disorder. Mr. McLaren's overconfidence in his abilities, externalization of the causality of his predicament, and irritability and aggression are all part and parcel of a personality disorder.

> In conclusion, this examiner is of the opinion the Defendant does not have a mental illness or mental deficiency that impairs his adjudicative competencies. Therefore, this examiner is of the opinion the Defendant has the basic capacity to comprehend his position, understand the nature and object of the proceedings against him, conduct his defense in a rational manner, and cooperate with counsel to the end that any available defense may be interposed if he so chooses.

[¶42] Dr. McCormick's reports make it clear that Mr. McLaren's behavior during trial was not different from the behaviors he had exhibited from the beginning of these proceedings. Because Mr. McLaren's conduct had not changed, there was no new information before the district court that would have given it reasonable cause to believe Mr. McLaren had developed a mental illness or deficiency making him unfit to proceed. We find that the district court did not abuse its discretion or violate Mr. McLaren's constitutional rights when it failed to suspend the proceedings on its own motion and request a third competency evaluation. *See Marshall*, 2016 WY 119, ¶ 19, 385 P.3d at 310; *Schaeffer*, 2012 WY 9, ¶ 34, 268 P.3d at 1058.

## II. Did constitutional error occur when trial counsel proceeded on a not guilty by reason of mental illness plea against the will of his client?

[¶43] While competency focuses on a defendant's mental capacity to understand and participate in his defense and must be continually monitored throughout the proceedings, *see* Wyo. Stat. Ann. § 7-11-302; *Marshall*, 2016 WY 119, ¶ 16, 385 P.3d at 309, the NGMI plea concerns only the defendant's

mental state at the time of the alleged crime. *See* Wyo. Stat. Ann. § 7-11-304. Wyoming statutes provide that a defendant "is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or· deficiency, he lacked substantial capacity either to .appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." Wyo. Stat. Ann. § 7-11-304. Through counsel, Mr. McLaren amended his original not guilty to plea to include an NGMI plea, as provided by this statute.[3]

[¶44] Mr. McLaren argues that the district court violated his constitutional right to due process when, despite repeated indications that he did not want to pursue his NGMI plea, the court failed to allow him to withdraw that plea. Resolution of this issue requires us to determine whether Wyoming's statutes and rules of criminal procedure allow an attorney to assert an NGMI defense over the objection of a competent defendant. This is a question of law which we will review de novo. *See In re RB*, 2013 WY 15, ¶ 16, 294 P.3d 24, 29 (Wyo. 2013); *Starrett v. State*, 2012 WY 133, ¶ 9, 286 P.3d 1033, 1036 (Wyo. 2012).

[¶45] Relevant portions of Wyo. Stat. Ann. § 7-11-304 state:

(a) *A · person is· not responsible for criminal conduct if at the time of the criminal conduct, as· a result of mental illness or deficiency, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to con-form his conduct ·to the requirements of the law.* As used in this section,. the terms mental illness or deficiency mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to self-induced intoxication as defined by W.S. 6-1-202(b).

(b) As used in this section, the terms "mental illness or deficiency" do not in-

clude an abnormality··manifested only by repeated criminal or otherwise antisocial conduct. .

· (c) Evidence that a person is not responsible for criminal conduct by reason of mental illness or deficiency is not admissible at the trial of the defendant unless a plea of "not guilty by reason. of mental illness or deficiency" is made. *A plea of "not guilty by reason of mental illness or deficiency" may be pleaded orally or in writing by the defendant or .his counsel* at the time of his. arraignment. The court, for good cause shown, may also allow that plea to be entered at a later time. Such a plea does not deprive the defendant of other defenses.

. . . .

(e) If an examination of a defendant's fitness to proceed has.been ordered pursuant to W.S. 7-11-303, an examination following a plea of "not guilty by reason of mental illness or deficiency" shall not occur, or be ordered, until the court has found the defendant is competent to proceed under W.S. 7-11-303.

(Emphasis added.) Rule 11 of the Wyoming Rules of Criminal Procedure provides:

(a) *Alternatives.—*

(1) In General.—A defendant.may plead not guilty, not guilty by reason of mental illness or deficiency, guilty,.or nolo contendere. If a defendant refuses to plead or if a defendant corporation. fails to appear, the court shall enter a plea of not guilty.

. . . .

(B) Mental Illness or Deficiency.—*A plea of "not guilty by reason of mental illness or deficiency" may be pleaded orally or in writing by the defendant or the defendant's counsel* at the time of the defendant's arraignment or. at such. later time as the court may for good cause permit. Such a plea does not deprive the defendant of other defenses and may be coupled with a plea of not guilty.

Emphasis added.)

---

3.  W.R.Cr.P. 12.2 requires a defendant who intends to rely upon the defense of mental illness or deficiency at the time of the alleged offense [to enter such a plea] at arraignment. For good cause the court may permit the plea

to be entered at a later time. If there is a failure to comply with the requirements of this subdivision, evidence of mental illness or deficiency may not be introduced. :

[¶46] Finally, Rule 1.2(a) of the Wyoming Rules of Professional Conduct requires defense counsel to "abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify."[4]

[¶47] Most jurisdictions hold that neither the trial court nor defense counsel may impose an insanity defense over the defendant's objection.[5] *See United States v. Marble*, 940 F.2d 1543, 1546-47 (D.C. Cir. 1991); *Lowenfield v. Phelps*, 817 F.2d 285, 292 (5th Cir. 1987), *aff'd*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) ("The circumstances are extremely rare when counsel is not required to follow his client's instructions on a decision [to forego the defense of not criminally responsible]."); *Foster v. Strickland*, 707 F.2d 1339, 1343 n.3 (11th Cir. 1983); *Snider v. Cunningham*, 292 F.2d 683, 685 (4th Cir. 1961) ("A prisoner who insists that he did not commit a crime can hardly be forced by his counsel to confess it in order to support a tenuous defense of insanity."); *State v. Bean*, 171 Vt. 290, 762 A.2d 1259, 1267 (2000); *Commonwealth v. Simpson*, 44 Mass.App.Ct. 154, 689 N.E.2d 824, 831 (1998), *rev'd on other grounds*, 428 Mass. 646, 704 N.E.2d 1131 (1999); *State v. Tenace*, 121 Ohio App.3d 702, 700 N.E.2d 899, 908 (1997); *Jacobs v. Commonwealth*, 870 S.W.2d 412, 418 (Ky. 1994), *overruled on other grounds by St. Clair v. Commonwealth*, 451 S.W.3d 597 (Ky. 2014); *People v. Morton*, 173 A.D.2d 1081, 1085, 570 N.Y.S.2d 846 (1991); *Treece v. State*, 313 Md. 665, 547 A.2d 1054, 1062 (1988); *Briggs v. United States*, 525 A.2d 583, 593 (D.C. 1987); *People v. Mac Dowell*, 133 Misc.2d 944, 947-48, 508 N.Y.S.2d 870, 872-73 (N.Y. Sup. Ct. 1986); *People v. Frierson*, 39 Cal.3d 803, 218 Cal.Rptr. 73, 705 P.2d 396, 401-05 (1985); *State v. Lowenfield*, 495 So.2d 1245, 1252 (La. 1985) ("It appears beyond argument that when a competent defendant wishes to plead not guilty rather than not guilty by reason of insanity, and clearly understands the consequences of his choice, then the counsel must acquiesce to the wishes of his competent client."); *State v. Peterson*, 70 Or.App. 333, 689 P.2d 985, 990-91 (1984); *State v. Higa*, 38 Wash.App. 522, 685 P.2d 1117, 1119-20 (1984); *State v. Jones*, 99 Wash.2d 735, 664 P.2d 1216, 1220 (1983) (en banc) ("[W]e concur in the belief that basic respect for a defendant's individual freedom requires us to permit the defendant himself to determine his plea."); *State v. Felton*, 110 Wis.2d 485, 329 N.W.2d 161, 174 (1983); *State v. Fayle*, 134 Ariz. 565, 658 P.2d 218, 229 (Ariz. Ct. App. 1982); *People v. Redmond*, 16 Cal. App.3d 931, 94 Cal.Rptr. 543, 548 (1971); *People v. Gonzalez*, 20 N.Y.2d 289, 282 N.Y.S.2d 538, 229 N.E.2d 220, 223 (1967).

[¶48] There are persuasive reasons why defendants should have the power to decide whether to plead NGMI. An acquittal on NGMI may "result in the institution of commitment proceedings which lead to confinement in a mental institution for a period longer than the potential jail sentence." *Frendak v. United States*, 408 A.2d 364, 376 (D.C. 1979); *see also Bean*, 762 A.2d at 1266 ([D]efendant "was aware of that consequence and, based on his personal experience, stated he would rather be in prison than in a secure mental institution."); *Treece*, 547 A.2d at 1060. In Wyoming, if a defendant is found not guilty by reason of mental illness or deficiency, the court must, under certain circumstances, "order him committed to the Wyoming state hospital or other designated facility for custody, care and treatment." Wyo. Stat. Ann. § 7-11-306(d) (LexisNexis 2017).

---

4. Similarly, the ABA Standards specify that decision of "what pleas to enter" must be made by "a competent client, after full consultation with defense counsel." *See* American Bar Association, *Criminal Justice Standards for the Defense Function*, § 4-5.2(b)(ii), available at https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourth Edition.html (last visited Dec. 22, 2017).

5. In contrast, a small minority of jurisdictions have concluded that under appropriate circumstances, the court may interpose a defense of insanity on behalf of a competent defendant who does not wish to assert that defense. *Hendricks v. People*, 10 P.3d 1231, 1242-43 (Colo. 2000); Christopher Slobogin & Amy Mashburn, *The Criminal Defense Lawyer's Fiduciary Duty to Clients with Mental Disability*, 68 Fordham L. Rev. 1581, 1630 (2000). Those courts focus on society's interest in not holding criminally liable those defendants who lack mental responsibility.

[¶49] Further, stigma may attach, however unreasonably, to a person with a mental illness. *Treece,* 547 A.2d at 1060; *Frendak,* 408 A.2d at 377; *Bean,* 762 A.2d at 1266. In addition, a defendant may elect to forego an NGMI plea because of a feeling that he was not mentally ill at the time of the crime or because he fears such a plea would be equivalent to an admission of guilt. As one court explained, "[t]he result of 'the successful interposition of a plea of insanity is not that an accused is to be found not guilty of the criminal act it was proved he had committed, but that he shall not be punished therefor.'" *Treece,* 547 A.2d at 1059 (quoting *Langworthy v. State,* 284 Md. 588, 399 A.2d 578, 584 (1979)).

[¶50] Finally, the assertion of an NGMI plea might conflict with a defense on the merits. *Bean,* 762 A.2d at 1267; *Treece,* 547 A.2d at 1060 (noting that the "credibility of his consent defense might have been substantially undermined if the jury accepted the notion that he was subject to delusions—the consent he testified to might have been a delusion").

▮ [¶51] Thus, because the defendant must bear the profound consequences of asserting an NGMI plea, a competent defendant should make the decision whether or not to invoke that plea.

> If a defendant has sufficient intelligence to rationally choose whether to stand trial, plead guilty, or enter a plea of mental irresponsibility, the choice is his—not that of his attorney—for the constitution gives him the right to appear and defend either in person or by counsel.

*Jones,* 664 P.2d at 1221 (internal citations omitted). Of course, if the defendant is represented, the decision should be made after consulting with counsel. But the decision belongs to the defendant. Likewise, a competent defendant should make the decision whether to withdraw an NGMI plea. *See Jones,* 664 P.2d at 1221; *Frendak,* 408 A.2d at 380. The State does not dispute that a competent defendant has the ultimate authority to decide what plea to enter. Rather, the State argues that the record does not support the conclusion that Mr. McLaren's NGMI plea was maintained against his will. The record, however, is replete with evidence of Mr. McLaren's opposition to the plea.

▮ [¶52] Mr. McLaren's first competency evaluation indicated he was competent to stand trial. At his arraignment, he pled not guilty to all the charges. Subsequently, at the October 6, 2014 motion hearing, his attorney explained to the court "I've discussed it with my client, and it looks like we will be changing our plea to NGMI. There is—we've got a couple additional consultations that we wanted to complete before we made that change, your Honor, but I would say that is certainly not outside the realm of possibility ...."[6]

[¶53] At the November 3, 2014 change of plea hearing, Mr. McLaren's attorney entered the NGMI plea to all counts on Mr. McLaren's behalf. At the hearing, the district court noted that W.R.Cr.P. 11(a)(1)(B) allows an NGMI plea to be entered by counsel on behalf of the defendant and accepted the plea without further discussion.[7] Subsequently, Dr. McCormick evaluated Mr. McLaren and concluded that there was no link between any psychosis Mr. McLaren was experiencing and his ability to distinguish between right and wrong at the time of the alleged conduct, and thus she concluded that he did not meet the statutory requirements for the assertion of an NGMI plea.

*Gamache,* 48 Cal.4th 347, 106 Cal.Rptr.3d 771, 227 P.3d 342, 372-73 (2010).

---

6. "[I]t may well be the proper course for defense counsel, at the early stages of a case, to file a plea" of NGMI if the facts appear to warrant it and the defendant agrees with that approach. *Treece,* 547 A.2d at 1062. Our rules require the NGMI plea to be entered at the time of arraignment and it may be entered later, only if permitted by the trial court "for good cause." W.R.Cr.P. 11(a)(1)(B) & 12.2(a). However, if, after an evaluation, it is revealed that the defendant was not mentally ill, counsel would be prudent to reevaluate the plea with the defendant and determine whether it should be withdrawn. *See People v.*

7. Mr. McLaren does not appear to raise the issue of whether his original NGMI plea was asserted against his will, but rather asserts the "right to enter into his chosen plea voluntarily" in the context of his argument that the trial court improperly allowed the NGMI plea to be maintained over his objections after it had been entered.

[¶54] At the November 23, 2015 pretrial conference, the district court had the following exchange with Mr. McLaren:

> Court: Well, and, Mr. McLaren, this is one of those areas where the choice belongs directly to you, whether you remain—whether you stand on your not guilty by reason of mental illness plea, or not. And from what I understand [defense counsel] saying, you want to do that?
>
> [Mr. McLaren]: Absolutely, your Honor.

This was the only time Mr. McLaren indicated his consent to the assertion of the NGMI plea.

[¶55] However, after his single acknowledgement of assent to the NGMI plea on November 23, 2015, Mr. McLaren repeatedly objected to the assertion of the NGMI plea.[8]

[¶56] Less than two weeks after the November 23 pretrial conference, at the December 2, 2015 motion hearing, Mr. McLaren informed the court that he wanted to fire his attorney because he did not "believe he's functioning in my best interest." He explained, "I went round and round with him about how he's telling me I'm mentally ill and stuff." Despite these concerns expressed by Mr. McLaren, his attorney indicated to the court that the defense intended to go forward with the NGMI plea.

[¶57] Again, at the December 4, 2015 motion hearing, Mr. McLaren explained that his problem with his attorney centered on the NGMI plea. His attorney had informed the district court that he requested another competency evaluation because he felt that Mr. McLaren would not be able to assist in his defense. Mr. McLaren responded, "The whole problem that me and [my attorney] are having here is an ethical issue, that I feel that he wants me to propagate a lie. I do not feel that I necessarily—that I—it is necessary that I go after this NGI [sic] thing. I don't feel that I'm incompetent." The court then said, "So, Mr. McLaren, you're saying that you do not want to stand on the plea of not guilty by reason of mental illness?" Mr. McLaren answered, "That's exactly what the problem is, your Honor. Exactly." The district court ordered a second competency evaluation.

[¶58] After the second competency evaluation had been conducted and Mr. McLaren was again found to be competent, the district court excused Mr. McLaren's attorney, and appointed his supervisor as counsel for Mr. McLaren. The supervising attorney indicated at that time that the NGMI defense was "something that Mr. McLaren and I still need to talk about." The court set a deadline of March 16, 2016 for Mr. McLaren to withdraw his NGMI plea. Defense counsel expressed no position on the plea by that deadline.

[¶59] After the deadline had passed, defense counsel requested that the NGMI plea not be mentioned until he introduced evidence on the issue at trial. The State objected to that approach, arguing that because it has the burden on everything except the NGMI plea and because potential jurors may have strong feelings about NGMI, it ought to be able to discuss the plea in voir dire and opening; the court requested that the parties

---

8. The record contains instances of Mr. McLaren's dissatisfaction with the NGMI plea prior to his November 23, 2015 consent, as well. For example, at the November 4, 2015 hearing on his attorney's motion to withdraw, Mr. McLaren expressed his dissatisfaction with his counsel and his disagreement with his attorney's insistence upon the NGMI plea:

> [Mr. McLaren]: Well, do you think there's good cause because he's not even familiar with my case, your Honor? After 20 months and two psychologists that said the same thing, that I wasn't insane? [My attorney's] whole thing here has been this NIT [sic] thing.
>
> . . . .
>
> Court: —you changed your plea to not guilty by reason of mental illness, and you agreed to do that.

> [Mr. McLaren]: [My attorney] suggested that we do that, and at a later date, we could change the plea to not guilty. I'm following his advice.
>
> Court: Okay. So—
>
> [Mr. McLaren]: Which I find at this point kind of ludicrous.

At another point in the hearing, Mr. McLaren complained that the only defense his attorney advised him of "was that I plead crazy." During the second day of the hearing, the district court acknowledged that earlier on, when the option for a second NGMI evaluation arose, "I got a sense that you [Mr. McLaren] weren't happy about the whole idea of not guilty by reasonable—by reason of mental illness."

brief the issue. The parties submitted briefs generally restating arguments they had made at the hearing. The district court issued an order addressing the NGMI issue solely in the context of voir dire.

[¶60] At trial, which commenced on April 11, 2016, Mr. McLaren's position regarding his NGMI plea remained unchanged and he repeatedly reiterated his opposition to it. During an offer of proof outside of the hearing of the jury, Mr. McLaren stated, "[T]his whole NGMI thing, it's on the record every time I tried to fire [my attorney], it's on record that I did not want to go with the NGMI thing. I'm on tape saying several times that I thought it was dishonest and unethical to even proceed in that manner, and now Mr.—now the prosecuting attorney is using that to make me look stupid?" Again, outside of the presence of the jury during the court's inquiry of Mr. McLaren regarding his right to remain silent and waiver of that right, Mr. McLaren explained, "As your Honor knows, this whole NIG [sic] thing I've been against since the beginning ...." And, while testifying, Mr. McLaren stated, "[T]his fifth NGI [sic] thing, which I've been fighting from day one, I've been in jail for 25 months fighting it. I don't think it's honorable for me to go NG [sic]—not guilty by reason of temporary insanity. I'm not insane." On cross examination, the prosecution asked him directly: "I guess just starting off, I'll make it clear, you're not guilty by mental illness?" Mr. McLaren responded, "I don't believe so."

[¶61] Despite his repeated protestations against the NGMI plea, that plea was asserted on behalf of Mr. McLaren. At trial, the defense called Dr. McCormick to testify as to her evaluation of his mental state during the alleged course of events and specifically whether she thought Mr. McLaren met the requirements for asserting an NGMI plea. She testified that he did not meet the statutory NGMI requirements due to his methamphetamine use, and that Mr. McLaren's description of his behavior during the alleged incident failed to "suggest a strong link between his psychosis and the capacity to determine right from wrong and conform his conduct to the requirements of the law." In closing, however, the defense argued that

Mr. McLaren was "in a psychosis. He's absolutely in a psychotic state, and we don't know when he's drifting in and out, and [Dr. McCormick] did say it raises to the level that it is severe enough, but it's self-induced, so we're not going to get the NGMI. You'll have to decide for yourself on the NGMI.... He does have 38 personalities." The jury was instructed on the NGMI plea.

[¶62] On this record, we must agree with Mr. McLaren's contention that he was denied due process when counsel continued to present the NGMI plea over his objections. Other courts have considered the propriety of trial courts' decisions to allow counsel to proceed with the insanity defense, or to withdraw the defense, against the will of the defendant on nearly identical facts. These courts have all reached the same conclusion as we do: where there is ample evidence in the record indicating that a defendant objects to the assertion of the NGMI defense, it is improper for the trial court to allow the defense attorney to proceed against the defendant's express objections. *See, e.g., Johnson v. State*, 117 Nev. 153, 17 P.3d 1008, 1015 (2001) ("The forced imposition of the insanity defense over the express objections of the defendant is structural error requiring reversal."); *Bean*, 762 A.2d at 1268 (Where the record of disagreement is clear, the "imposition of the insanity defense over defendant's objection is grounds for reversal of the conviction."); *Tenace*, 700 N.E.2d at 906 ("[A]n attorney is free to make a tactical decision regarding what plea to enter only when a client does not choose to make the decision or does not object on the record;" the withdrawal of insanity plea against the express wishes of the defendant requires reversal.).

[¶63] As we have held, the decision whether to plead NGMI belonged to Mr. McLaren, and where, as here, he gave strong and repeated indications that he did not agree with that decision, the district court at the very least had a duty to inquire into whether Mr. McLaren continued to voluntarily assert it. The district court certainly acted within its discretion when it set the March 16 deadline to withdraw the plea, but the record before it required the district court to do more than rely upon the silence of counsel (counsel that

continued to maintain the plea against the will of Mr. McLaren) before allowing the defense to continue to assert NGMI. Mr. McLaren's due process rights to enter a voluntary plea were violated when the district court continued to ignore Mr. McLaren's repeated proclamations on the record that he did not wish to proceed with the NGMI plea. For these reasons, we must reverse.

***III. Did structural error occur in connection with Mr. McLaren's attempted second-degree murder conviction because the jury instructions did not indicate that the State had to prove beyond a reasonable doubt that Mr. McLaren did not act in a sudden heat of passion?***

[¶64] Regarding the attempted second-degree murder count, the district court provided the following instructions to the jury:

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of Attempted Murder in the Second Degree, charged in Count I of the Information, he may, however, be found guilty of Attempted Manslaughter, which is necessarily included in the offense charged, if the evidence is sufficient to establish his guilt of such lessor offense beyond a reasonable doubt.

Instruction No. 23 (first paragraph).

The elements of the crime of Attempted Manslaughter, a lesser included offense of the crime of Attempted Murder in the Second Degree as charged in Count I of the Information, are:

1. On or about the 10th day of March, 2014

2. In Sweetwater County, Wyoming

3. The Defendant, Steven Dean McLaren

4. Voluntarily

5. Upon a sudden heat of passion

6. Attempted to kill Jennifer Evans

7. By positioning his vehicle on Highway 191 in the path of oncoming southbound traffic.

If you find from your consideration of all of the evidence that the State has not

proved all of these elements beyond a reasonable doubt, then you should find the Defendant Not Guilty.

Instruction No. 27. The verdict form read:

1. We the jury, duly empaneled and sworn to try the above entitled cause, do find that as to the crime of Attempted Murder in the Second Degree charged in Count I of the Information the Defendant, Steven Dean McLaren, is:

☐ Not Guilty

☐ Guilty by Reason of Mental Illness or Deficiency

☐ Guilty

If you find the defendant Not Guilty in #1, then proceed to #2. If you find the defendant Not Guilty by Reason of Mental Illness or Deficiency or Guilty in #1, do not answer #2.

2. As to the crime of Attempted Manslaughter, we find the Defendant, Steven Dean McLaren:

☐ Not Guilty

☐ Not Guilty by Reason of Mental Illness or Deficiency

☐ Guilty

[¶65] Mr. McLaren contends that structural error occurred regarding his conviction for attempted second-degree murder because these instructions did not indicate that the State was required to prove that he did not act under a sudden heat of passion. The State does not dispute Mr. McLaren's contention that, under our recent decision in *Shull v. State*, 2017 WY 14, 388 P.3d 763 (Wyo. 2017), *overruled in part by Schmuck v. State*, 2017 WY 140, ¶ 31, 406 P.3d 286, 297 (Wyo. 2017), the jury was incorrectly instructed on the burden of proof for "sudden heat of passion," and that the error is reversible regardless of prejudice because it is structural error. The State urges us to reconsider our decision in *Shull* to return "sudden heat of passion" to its rightful place as part of an element of voluntary manslaughter rather than a mitigator to first- or second-degree murder, and to review allegations of such error in our usual framework for claims of instructional error, rather than as structural error.

[¶66] In *Schmuck v. State*, 2017 WY 140, 406 P.3d 286 (Wyo. 2017), we agreed with the State that these errors are instructional and not structural, *Id.* at ¶ 31, 406 P.3d at 297, but concluded that the jury must be informed that "the State has the burden of showing the absence of a sudden heat of passion, once the defendant has made the necessary showing." *Id.* at ¶ 29, 406 P.3d at 296.

"Voluntarily, upon a sudden heat of passion," will continue to be an element of the crime of voluntary manslaughter that the State must prove beyond a reasonable doubt in order to convict the defendant of voluntary manslaughter. Stepped verdict forms can still be provided to juries. And rather than assume the jury understands that malice and sudden heat of passion are mutually exclusive, ... it is the State's burden to prove malice and disprove sudden heat of passion beyond a reasonable doubt, [and] the jury should be expressly instructed to that effect.

*Id.*

[¶67] We need not engage in plain error analysis here, when the matter will be remanded for a new trial on other grounds. It is not difficult to propose a workable series of jury instructions which would include in the instructions an explanation that a finding of sudden heat of passion negates malice. *Schmuck*, 2017 WY 140, ¶ 29, 406 P.3d at 296. Therefore, if, on retrial, Mr. McLaren presents evidence of heat of passion, pursuant to *Shull* and *Schmuck*, the trial court must instruct the jury of the State's burden to prove the absence of heat of passion in order to convict him of attempted second-degree murder.

### CONCLUSION

[¶68] Because Mr. McLaren's conduct had not changed over time, the district court did not err in failing to sua sponte order a third competency evaluation. However, the district court violated Mr. McLaren's due process rights when, in spite of numerous indications that the plea was contrary to his will, it allowed the defense to assert the NGMI plea at trial. Although the jury should have been instructed that it was the State's burden to demonstrate, for purposes of first- and sec-

ond-degree murder, that Mr. McLaren did not act in sudden heat of passion, the error was not structural. We reverse and remand for proceedings consistent with this opinion.